# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| CATHRYN BONNETTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-2110 (ABJ) |
| | ) | |
| ERIC K. SHINSEKI, Secretary, | ) | |
| Department of Veterans Affairs, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

Plaintiff Cathryn Bonnette brings this action against defendant Eric K. Shinseki, Secretary of the U.S. Department of Veterans Affairs ("VA"), alleging that she was discriminated against on the basis of her disability (Count I) and retaliated against after she filed EEO complaints against her employer (Count II). Bonnette, who is blind, also charges in Count I that the agency failed to reasonably accommodate her disability.

The complaint purports to bring both counts under the Americans with Disability Act of 1990, 42 U.S.C. § 12101, *et seq.* (2006) ("ADA"). *See* Compl. [Dkt. # 1] ¶¶ 110–13 (First cause of action: disability discrimination and failure to accommodate); *id*. ¶ 119 (Second cause of action: "Defendant's actions constituted a violation of retaliation under the ADA."). But the "ADA does not apply to employees of the federal government because the federal government is not considered an 'employer' under the ADA." *Klute v. Shinseki*, 797 F. Supp. 2d 12, 17 (D.D.C. 2011); *see also* 42 U.S.C. § 12111(5)(B)(i) (specifically excluding "the United States" from the definition of "employer"). To protect federal workers, Congress incorporated the ADA's anti-discrimination and anti-retaliation provisions into the Rehabilitation Act of 1973, 29

U.S.C. § 791, *et seq.* (2006) ("Rehabilitation Act").  *See Woodruff v. Peters*, 482 F.3d 521, 526

(D.C. Cir. 2007); *see also* 29 U.S.C. § 791(g); 42 U.S.C. § 12112(a); *Marshall v. Potter*, 634 F.

Supp. 2d 66, 73 (D.D.C. 2009), citing 29 U.S.C. § 794(d).   Because the Rehabilitation Act

incorporates the ADA, it is "the exclusive remedy for employment discrimination based on a

disability for federal employees."  *Raines v. DOJ*, 424 F. Supp. 2d 60, 64 (D.D.C. 2006) (internal

citations and quotation marks omitted).   Therefore, as both parties have done in their briefing, the

Court will assess Bonnette's claims that she was discriminated and retaliated against on the basis

of her disability as if they had been brought under the Rehabilitation Act.  *See, e.g.,* Def.'s Mem.

in Supp. of Mot. for Summ. J. [Dkt. # 20] ("Def.'s Mem.") at 5–8; Pl.'s Mem. in Opp. to Def.'s

Mot. for Summ. J. [Dkt. # 24] ("Pl.'s Opp.") at 7–9.[1]

    In her complaint, Bonnette recites a series of factual allegations that range from petty

slights – the disparagement of Bonnette's Christmas tree – to significant adverse events,

including her termination from the agency, and she premises both causes of action on those facts.

The VA seeks judgment on the pleadings, or, in the alternative, summary judgment on all counts.

Def.'s Mot. for J. on the Pldgs or, in the alternative, for Summ. J. [Dkt. # 20] ("Def.'s Mot.").

---

[1]    In their briefs, both parties have analyzed Bonnette's claims as if they arose under both the Rehabilitation Act and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII").   But the complaint does not mention Title VII, nor does it allege any form of discrimination other than mistreatment of the plaintiff based on her disability.   Indeed, it does not even specify her race, religion, or national origin.   It is true that the second cause of action alleges that the defendant took the actions challenged in this case "because of Plaintiff's EEO complaints," Compl. ¶ 122, and those filings, unlike the instant lawsuit, complained of discrimination based upon plaintiff's age as well as her disability, but age discrimination would be actionable under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 633a, *et. seq.* ("ADEA"), not Title VII.   Thus, the Court will consider the complaint as if it had been filed under the Rehabilitation Act alone, but it notes that the result in this case would be the same under either framework.   Ultimately, Title VII factors into the legal analysis anyway because section 501 of the Rehabilitation Act incorporates section 107 of the ADA, which in turn incorporates the remedies and procedures established in Title VII.  *See Woodruff,* 482 F.3d at 526; 42 U.S.C. § 12117(a).

The VA contends that many of the actions that Bonnette characterizes as discriminatory and/or retaliatory do not constitute actionable adverse employment actions within the meaning of the Rehabilitation Act, and that any adverse employment actions that were taken can be explained by legitimate, nondiscriminatory, and non-retaliatory reasons.  Def.'s Mem. at 21–41.  It further argues that the agency provided Bonnette with the reasonable accommodations that she required, *id*. at 14–21, and that the circumstances presented in the complaint do not rise to the level of severity necessary to make out a hostile work environment claim, *id*. at 41–43.[2]  While the Court does not wish to minimize the substantial obstacles that Bonnette was required to overcome in her efforts to meet the demands of her job without the benefit of sight, it concludes that the undisputed facts support the VA's contentions, and it will grant motion for summary judgment on all counts.

## BACKGROUND

The complaint sets out the fact that plaintiff Cathryn Bonnette is "totally blind" and thus disabled.  Compl. ¶ 22.  In March 2007, the VA hired her under Schedule A, a special hiring authority for individuals with targeted disabilities, subject to a two-year probationary period. EEO Affidavit of Ralph Torres (July 7, 2009), Ex. 4 to Def.'s Mot. ("Torres EEO Aff.") at 348. After the two-year probationary period, the VA could decide to retain Bonnette or terminate her employment with the agency.  SF-50 Excepted Appointment, Ex. 7 to Def.'s Mot.; Tracey Therit Deposition (Oct. 26, 2011), Ex. 6 to Def.'s Mot. ("Therit Dep.") at 13:16–14:1, 16:4–12. Bonnette was terminated at the conclusion of the two years, Nonconversion of Schedule A Appointment, Ex. 16 to Def.'s Mot. ("Nonconversion Notice"), but she was reinstated shortly

---

2       The words "hostile work environment" cannot be found anywhere in the complaint either, but the Court will construe Bonnette's claims broadly to include that form of discrimination and retaliation since in her opposition, Bonnette accepted the VA's invitation to read that allegation into the cause of action, and both parties have briefed the issue.

thereafter for another period that also eventually concluded with her termination, Bonnette Deposition (Aug. 11, 2011), Ex. 1 to Def.'s Mot. ("Bonnette Dep.") at 76:14–19, 176:4–6. Bonnette ascribes these actions to discrimination and retaliation, and she alleges that the agency did not make the reasonable efforts necessary to accommodate her disability and enable her to succeed.   While the complaint does not always include the dates that could serve as helpful signposts, it appears that the general chronology of events is as follows:

**I.   Two Year Probationary Period:  March 2007 to February 2009**

During her tenure with the agency, Bonnette served as an ADR program specialist in the VA's Office of Resolution Management ("ORM").   SF-50 Excepted Appointment, Ex. 7 to Def.'s Mot.   ORM does not mediate disputes itself, but it arranges for mediations to take place by performing such tasks as scheduling.   Therit EEO Affidavit (June 30, 2009), Ex. 3 to Def.'s Mot. ("Therit EEO Aff.") at 297–98; Def.'s St. of Material Facts as to Which there is no Genuine

Dispute [Dkt. # 20–1] ("Def.'s St. Facts") ¶ 5.[3]  Bonnette was responsible for working with other ADR groups, producing materials that promoted the use of ADR services, managing the drafting of a VA-wide handbook for certification of ADR neutrals, and coordinating teleconferences for VA certified mediators.  Position Descriptions, Exs. 9–10 to Def.'s Mot.; Bonnette Dep. at 58:8–59:1, 64:6–8.  Specifically, she was responsible for arranging and identifying topics and speakers for monthly teleconferences for the mediators.  Therit Dep. at 151:14–19.

Rafael Torres, the Deputy Assistant Secretary for Resolution, who served as Bonnette's immediate supervisor from March 2007 to May 2008, rated Bonnette's performance as "fully successful" during that period.  Bonnette Performance Appraisals, Ex. 23 to Def.'s Mot. at 408-13.  Based on that rating, Bonnette was promoted from GS-11 to GS-12 in March 2008, and she continued to serve as an ADR program specialist.  Bonnette Dep. at 52:16–17.  In May 2008, Tracey Therit, the ADR Director, became Bonnette's immediate supervisor.  *Id.* at 93:8–10;

---

3       Local Rule of Civil Procedure 7(h)(1) requires a party opposing a motion for summary judgment to file

> a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement . . . .  In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

LCvR 7(h)(1).  As the VA contends, if a party opposing the motion fails to comply with this rule, then "'the district court is under no obligation to sift through the record and should [i]nstead . . . deem as admitted the moving party's facts that are uncontroverted by the nonmoving party's Rule [LCvR 7(h)(1)] statement.'"  *SEC v. Banner Fund Int'l*, 211 F.3d 602, 616 (D.C. Cir. 2000), quoting *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 154 (D.C. Cir. 1996).  Although Bonnette filed a statement pursuant to Rule 7(h)(1), for several paragraphs, she did not cite to specific parts of the record controverting the VA's statement of undisputed facts as required by the local rules.  So the Court will deem those paragraphs to be admitted.  *See id.* (holding that the district court was "fully justified" in treating the moving party's statement of material facts as admitted where the non-moving party did not provide citations disputing the moving party's "lengthy statement of undisputed facts").

Therit Dep. at 10:14–16.  The record indicates that this did not turn out to be a successful pairing for Bonnette.

Initially, Bonnette requested reassignment to a different supervisor and asked to become an EEO counselor.  Bonnette Dep. at 119:16–21; Def. St. Facts ¶ 41.  The VA has stated that it denied this request because Bonnette was not qualified for the EEO counselor position.  Def.'s St. Facts ¶¶ 42–45.  Based in part on input from Torres, Therit rated Bonnette as "fully successful" again in September 2008.  Bonnette Performance Appraisals, Ex. 23 to Def.'s Mot. at 414–22.  But during this evaluation, Therit also informed Bonnette of areas in which her performance needed improvement.  Therit EEO Aff. at 316.

On December 10 and 11, 2008, Therit contacted Human Resources about whether the VA should retain Bonnette after her probationary period.  Ex. 27 to Def.'s Mot.  A few days later, in a December 16, 2008 email, Therit informed Bonnette of specific deficiencies in her performance and stated that Bonnette might not be retained after the probationary period.  Ex. 28 to Def.'s Mot.  In the email, Therit also asked Bonnette to complete a series of tasks by the end of the month.  Id.  According to the VA, Bonnette failed to accomplish a number of them, including coordinating central office ADR awareness training, coordinating mediator teleconferences on a quarterly basis, updating the agency's website, and revising a document on tips for preparing settlement agreements.  Therit EEO Aff. at 317.

Bonnette admits that she failed to update the ADR website in December 2008, failed to draft a document containing tips for settlement agreements, missed other deadlines, and made typographical errors.  See Bonnette Dep. at 142:20–23, 144:19–145:21.  However, she asserts that Therit prevented her from accomplishing these tasks by refusing to provide the necessary approvals.  Id. at 140:25–141:11.

In January 2009, Bonnette contacted an EEO counselor, and she ultimately alleged sixteen acts of discrimination based on her disability and age.  Bonnette 2009 EEO Claims, Ex. 21 to Def.'s Mot.  She did not allege retaliation at that time. *Id.*; Def.'s St. Facts ¶ 81.  In February 2009, the VA decided to not retain Bonnette after her two-year probationary period. *See generally* Nonconversion Notice.  It placed her on paid administrative leave for two weeks until her February 27, 2009 termination date.  Pl.'s Opp. at 2.  In addition to a number of alleged general performance deficiencies, the VA identified the following reasons for Bonnette's termination in the Nonconversion Notice:

A.  <u>Disclosure of Confidential Information</u>

In February 2008, while scheduling a mediation, Bonnette failed to edit two attachments and disclosed the case number and names of other VA employees who previously participated in the mediation.  Nonconversion Notice at 2.  Therit advised Bonnette of her error, reported the privacy violation to the ORM Privacy Officer, and asked Bonnette to contact all recipients and ensure they deleted the attachments.  *Id*.  Therit also asked to review such emails in the future before Bonnette sent them and Bonnette completed General Privacy Awareness Training at that time.  *Id*.

On December 5, 2008, while scheduling another mediation, Bonnette emailed party information to a group of thirty-one qualified VA mediators.  *Id*.  Therit informed Bonnette that party information should only go to the VA employee who actually volunteers to mediate a case and not to all VA mediators.  *Id*.  Bonnette stated that she would follow this procedure in the future.  *Id*.  Again, on December 9, 2008, Bonnette sent information regarding another VA employee's mediation while scheduling a mediation session.  *Id*.  Bonnette stated that she did not know that information from another case was at the beginning of the email string and Therit

discussed various procedures that would help avoid this error in the future. *Id*. Therit reported the third privacy violation to the ORM Privacy Officer and instructed Bonnette to take steps to remedy the situation. Therit EEO Aff. at 329. In response to Therit's inquiry as to why Bonnette did not ask her to review the email before she sent it, Bonnette stated that she did not have time. *Id*.

B. Improper Use of a Government Travel Card

Bonnette held a government travel card at least until she was terminated in February 2009. Def.'s St. Facts ¶ 52, *accord* Pl.'s St. of Material Facts in Dispute [Dkt. # 25–1] ("Pl.'s St. Facts") ¶ 49. In April 2008, she received ORM's Government Travel Credit Policy, which states that the government issued card should only be used on official travel. Therit EEO Aff. at 311. But Bonnette used her government travel card at a working lunch in the District of Columbia in August 2008. Bonnette Dep. at 134:14–135:4. She explains that she accidentally used the government card because she could not distinguish between her personal credit card and the government issued card. *Id*. Moreover, she avers that she was confused about the appropriate use of the card because the credit card policy was difficult to navigate using the Job Access With Speech (JAWS) technology installed on her computer to accommodate her disability. *Id*. Bonnette was admonished on August 29, 2008 for the unauthorized use of the credit card in violation of VA Directive 0631.1. *Id*. at 136:21–137:17; Def.'s St. Facts ¶ 49.

C. Failure to Attend Mandatory Training

On December 10 and 11, 2008, Bonnette was scheduled to attend mandatory Crucial Conversations training. Bonnette Dep. at 164:18–25. The training conflicted with holiday caroling and an open house that Bonnette wanted to attend. *Id*. She tried to exchange training dates with another employee but was unsuccessful. *Id*. at 165:2–5. Nonetheless, Bonnette

8

skipped the training on the morning of December 11 in order to attend the caroling and holiday open house, and she sent her reader/sighted assistant in her stead. *Id*. at 166:17–167:13. She asserts that she only missed two hours of the training and that her prior supervisor, Torres, and the trainer gave her permission to miss the training session. Pl.'s St. Facts ¶ 53. The VA disputes that assertion, noting that Bonnette simply informed the trainer that she would miss part of the training because of a Christmas party. Letter of Reprimand (Jan. 30, 2009), Ex. 15 to Def.'s Mot. ("Reprimand Letter") at 2. Additionally, Torres has very limited recollection of this event and does not remember giving Bonnette permission to skip the training. *See* Torres EEO Aff. at 369. Therit discovered Bonnette's absence on December 30, 2008 and reprimanded her on January 30, 2009 for "her unauthorized absence from the training and for inappropriate use of the reader/sighted assistant services." *See* Reprimand Letter; *see also* Def.' St. Facts ¶ 53.

## II.   Reinstatement:  March 2009 to March 2010

On March 17, 2009, the VA reinstated Bonnette to her former position and placed her under Therit's continued supervision. Therit EEO Aff. at 326–27. Bonnette had ninety days to demonstrate successful performance. Therit Dep. at 150:9–11. As part of the reinstatement, Bonnette developed a return to work plan which required her to draft timelines for her assignments. *Id*. at 124:11–15. Pursuant to the plan, she was not allowed to begin work on a project until a completed timeline was submitted to Therit and approved. *Id*. at 144:2–6. There were other VA employees at the time who were also required to use timelines if they were working on certain projects. *Id*. at 127:5–128:12. Therit and Bonnette also created a joint performance plan that included timelines for Bonnette's accomplishment of specified employment goals. *Id*. at 135:16–137:4.

But Bonnette's second stint at the VA did not go well either, and she complains here about a series of discomfiting circumstances.  She alleges that when she returned to the agency in March of 2009, the files and folders saved on her computer had been renamed and scattered so that she could not find them. Compl. ¶ 101. Rosa Franco, Associate Deputy Secretary for Dispute Resolution Management and Therit's immediate supervisor, asked Bonnette to document the problems, and she assigned Glenn Thomas, ORM Information Technology Program Manager to help resolve them.   Def.'s St. Facts ¶ 69, *accord* Pl.'s St. Facts ¶ 69. Bonnette also alleges that after she returned in March 2009, it took two weeks to obtain the data watch card she needed to access locked areas, and therefore, she had to request a security escort each time she used the restroom.  Def.'s St. Facts ¶ 70, *accord* Pl.'s St. Facts ¶ 70.   Bonnette initially obtained a card from the building engineer, but Therit required her to return it and request another from the Program Support Assistant who tracked the cards by card number and reported any problems to the card provider.  *Id*.  No ORM employee was permitted to receive a data card from the building engineer.  *Id*.

Upon her reinstatement, Bonnette was assigned a new sighted reader, Adrienne Leal. Bonnette did not approve of Leal, and she stated that Leal read in a "stilted manner", paraphrased, subvocalized, and wore irritating perfume.  Def.'s St. Facts ¶ 31; Pl.'s Opp. at 19. Therit accepted Bonnette's feedback and worked with Leal to resolve these issues.   Email Correspondence Between Therit and Bonnette (Apr. 30–May 4, 2009), Ex. 15 to Pl.'s Opp. Another blind employee used Leal's services and made no complaint about the quality of her performance.  Defendant's Answers to Plaintiff's Interrogatories, Ex. 11 to Def.'s Mot. at 19. But Bonnette remained unsatisfied and continued to request a new sighted reader.  Pl.'s Opp. at 18–20.

On June 15, 2009, Bonnette sent an email to Therit expressing her dissatisfaction with Leal and with Therit's alleged interference with attempts to train her: "Tracy . . . My response to your message is that I am researching my options for supervision of the reasonable accommodation of a reader/sighted assistant. My understanding is that it is an EEO Violation to be deprived of the ability to provide supervision and direction to my reader/sighted assistant . . . ." Ex. 7 to Pl.'s Opp. The VA did not replace Leal but she left voluntarily in December 2009. Therit Dep. at 67:2–15.

On July 24, 2009, the VA placed Bonnette on a Performance Improvement Plan ("PIP"). Ex. 17 to Def.'s Mot. The PIP memorandum stated that Bonnette's performance was "less than fully successful" between April and July 2009. *Id*. When the PIP concluded in November 2009, Therit reported that Bonnette was not performing at a fully successful level and determined that the VA should not retain her. Letter from Therit to Bonnette (Nov. 16, 2009), Ex. 18 to Def.'s Mot. The VA terminated Bonnette effective March 22, 2010. Proposed Removal Letter (Mar. 22, 2010), Ex. 19 to Def.'s Mot.

When Bonnette left the VA, Therit submitted Bonnette's employment badge to the badging office. Therit Dep. at 197:8–12. The Deputy Assistant Secretary for Security and Law Enforcement issued a security alert warning barring Bonnette's admission to the building. Alert Notice (Mar. 22, 2010), Ex. 20 to Def.'s Mot. Bonnette asserts that Therit was behind the issuance of this alert, Pl.'s Opp. at 23, but the VA denies Therit's involvement, Def. St. Facts ¶ 79. Bonnette filed her second EEO complaint on June 9, 2010, asserting that she was terminated based on retaliation, disability, and age. 2010 Notice of Accepted Claims (Jan. 4, 2011), Ex. 22 to Def.'s Mot.

### III.    Accommodations of Bonnette's Disability

In her first cause of action, Bonnette alleges that she requested such accommodations as a seeing eye dog, an "appropriate reader," the JAWS computer software, and "all other scanning and adaptive equipment," and that the VA failed to reasonably accommodate her.  Compl. ¶¶ 112–13.  She raises concerns about how the agency handled her use of the bathrooms and its attitude towards her service animal.  *Id.* ¶¶ 90, 112.  But the VA has come forth with evidence to show that it provided assistive technology and sighted readers, and it made the arrangements necessary to enable Bonnette to be accompanied by her service dog.  Def.'s St. Facts ¶¶ 21–39. The assistive technology included the JAWS text-to-speak software; a Criswell scanner, which converts files into accessible documents; a PAC mate for note taking; and a hand cassette for audio recording.  *Id.* ¶ 22.

There were three restrooms available for the people who worked in Bonnette's office suite:  a men's room, a ladies' room, and an executive unisex restroom, which was originally reserved for the individual serving in Mr. Torres's supervisory position.  Therit EEO Aff. at 295. Bonnette complains that the VA instructed her to not use the ladies' room and instead required her to use the unisex restroom.  Pl.'s St. Facts ¶ 23.  The VA explains that Bonnette was provided with a key to the executive restroom because she navigated the building with her dog, and some female employees were allergic to dog hair.  Def.'s St. Facts ¶ 23; Therit EEO Aff. at 295.

To make it possible for Bonnette to be assisted by her dog in an office with colleagues with allergies, the VA arranged for frequent vacuuming, and it paid $800 for a special air filter to remove the dog's dander.  Torres EEO Aff. at 349.  In addition, it allowed Bonnette to provide training to other employees on working with people with visual disabilities and their service

animals, and it took steps to address Bonnette's complaints of mistreatment from her co-workers about her service dog.  Def.'s St. Facts ¶¶ 35–38, *accord* Pl.'s St. Facts ¶¶ 35–38.  On one occasion, Therit allegedly asked Bonnette to take the dog farther away from the building to a highly trafficked area so that the dog could relieve itself.  Pl.'s Opp. at 20–21.  Bonnette felt that this request was unreasonably dangerous due to her disability.  *Id.*

When Bonnette began work at the VA, she did not want a sighted reader, but eventually she requested one.  Def.'s St. of Facts ¶ 24.  The VA provided her with a reader in August 2007 when she travelled for work purposes, and it eventually hired a full-time reader for her.  *Id.* Bonnette was involved in the hiring process for readers:  she reviewed their resumes and participated in their interviews.  *Id.* ¶ 26.  She also worked with Therit to create a list of the sighted readers' duties and participated in their training.  Therit Dep. at 106:1–107:19; *see also* Def. St. Facts ¶¶ 27–28.  Therit estimates that Bonnette had five to ten readers over the course of her employment, including Adrienne Leal.  Therit Dep. at 33:18–34:18.  After Leal's departure, Bonnette worked with Cassandra Harmon and was satisfied with her performance.  Pl.'s Opp. at 20.

IV.     **Remaining Allegations**

Bonnette also alleges in her complaint that the VA failed to pay her for the overtime that she worked.  Compl. ¶ 26.  In response, the VA states that overtime requires advanced approval and that Bonnette never obtained such approval.  Def.'s St. Facts ¶ 20.

Bonnette asserts that Therit "nitpicked" her work and caused her to miss deadlines by refusing to provide the necessary approvals for her projects in a timely manner.  Pl.'s Opp. at 14.  The VA responds that Therit always paid great attention to detail, even to the point of pointing out the grammatical and stylistic mistakes in Bonnette's employment application.  Def.'s St.

Facts ¶¶ 9, 18–19.  It further asserts that this attention to detail did not cause Bonnette to miss her deadlines.  Def.'s Reply in Supp. of Def.'s Mot. for J. on the Pldgs, or in the alternative for Mot. for Summ. J. [Dkt. # 28] ("Def.'s Reply") at 12–13.

Finally, Bonnette alleges that Therit ridiculed a Christmas tree in her office in December 2008, Compl. ¶ 74, reduced her job responsibilities, *id*. ¶¶ 78, 98–99, publicly embarrassed and humiliated her, *id*. ¶¶ 46, 89, 100, gave her short deadlines, *id*. ¶ 97, unjustifiably reprimanded her, *id*. ¶¶ 81–82, delayed her departure from work, *id*. ¶ 53, and isolated her from her co-workers, *id*. ¶ 94.  Defendant denies these allegations.  Def.'s Mem. at 21–43.

## STANDARDS OF REVIEW

### I.     Judgment on the Pleadings

A motion for judgment on the pleadings pursuant to Rule 12(c) may be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Longwood Vill. Rest., Ltd. v. Ashcroft*, 157 F. Supp. 2d 61, 66 (D.D.C. 2001), citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  Put another way, "[i]f there are allegations in the complaint which, if proved, would provide a basis for recovery, the Court cannot grant judgment on the pleadings."  *Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d 95, 99 (D.D.C. 2008) (citations  and quotation marks omitted).

"The standard of review for such a motion is essentially the same as the standard for a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6)."  *Longwood*, 157 F. Supp. 2d at 66–67.  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In *Iqbal*, the Supreme

Court reiterated the two principles underlying its decision in *Twombly*:  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  556 U.S. at 678.  And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id*. at 679.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  A pleading must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id*.  In evaluating a motion for judgment on the pleadings under Rule 12(c), the court may consider facts alleged in the complaint as well as documents attached to or incorporated by reference in the complaint.  *Qi v. FDIC*, 755 F. Supp. 2d 195, 199–200 (D.D.C. 2010).

## II.   Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing there is a

genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

In assessing a party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.  The non-movant may not, however, rest upon the mere allegations or denials of its pleadings, but must instead establish more than "[t]he mere existence of a scintilla of evidence" in support of its position.  *Anderson*, 477 U.S. at 252.  The court will "not accept bare conclusory allegations as fact." *Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997); *see also District Intown Props., Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999) ("[T]he court must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record.").

A motion for judgment on the pleadings must be treated as a motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court." Fed. R. Civ. P. 12(d); *see also Yates v. District of Columbia*, 324 F.3d 724, 725 (D.C. Cir. 2003) (holding that district court's consideration of matters outside the pleadings converted the defendant's Rule 12 motion into one for summary judgment).  Because both parties have submitted matters outside of the pleadings, and the Court will consider them in the resolution of at least some issues presented by this motion, the Court will treat it as one for summary judgment.

## ANALYSIS

Bonnette asserts that the VA discriminated against her because of her disability, retaliated against her because of her EEO complaints, failed to reasonably accommodate her disability, and subjected her to a hostile work environment, all in violation of the Rehabilitation Act.  Pl.'s Opp. at 5, 21.  The VA seeks dismissal of Bonnette's claims under Rule 12(c) or alternatively, Rule 56, on the grounds that Bonnette failed to establish a prima facie case for her claims and/or failed rebut the VA's legitimate, nondiscriminatory, and non-retaliatory reasons for the challenged actions.  Def.'s Mem. at 8–43.[4]

## I.  Discrimination and Retaliation Claims

A.  <u>Legal Standard</u>

Allegations of discrimination and retaliation under the Rehabilitation Act are analyzed under the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Woodruff*, 482 F.3d at 528–29; *Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 16 (D.C. Cir. 2009).  Under this framework, the plaintiff has the initial burden of establishing a prima facie case by a preponderance of the evidence.  *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003), citing *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002).  To prove discrimination in the absence of direct evidence of discrimination, plaintiff must demonstrate that:  "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."

---

4       In its answer to Bonnette's complaint, the VA also argues that Bonnette failed to exhaust administrative remedies with respect to three of her claims:  the allegations regarding the disclosure of Bonnette's disability to others without her permission, Compl. ¶ 43; an oral reprimand for walking to work with co-workers, *id*. ¶ 81; the denial of the opportunity to mediate disputes, *id*. ¶ 82; and the denial of a business credit card, *id*. ¶ 87.  Ans. [Dkt. # 4] ¶¶ 43, 81, 82, 87.  The record seems to support this affirmative defense but since the VA did not expressly move to dismiss these claims on those grounds and give Bonnette the opportunity to respond, that defense is not the basis for the Court's decision.

*Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006).  To establish a prima facie case of retaliation, the plaintiff must show:  "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two."  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009); *see also Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009); *Rochon v. Gonzales*, 438 F.3d 1211, 1219–20 (D.C. Cir. 2006).[5]

If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a "legitimate, nondiscriminatory reason" for its actions.  *Jones*, 557 F.3d at 677 (internal quotation marks and citations omitted).  If the employer offers a legitimate explanation for its decision, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory [or retaliatory] reason."  *Kersey*, 586 F.3d at 17 (internal citations and alterations omitted); *see also U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983).

The VA does not contest that Bonnette is a member of a protected class, or that her EEO complaints constituted statutorily protected activity.  *See generally* Def.'s Mem.  It asserts, however, that a number of the incidents recounted in the complaint were not "adverse" and that for the few alleged employment decisions that satisfy that element, Bonnette has failed to rebut the VA's legitimate, non-retaliatory, and nondiscriminatory explanations.  The Court agrees with both points, and will dismiss Bonnette's retaliation and discrimination claims under Rule 56.

---

5      The elements of retaliation and discrimination claims are the same under Title VII and the Rehabilitation Act.  *Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010) (citations omitted) (stating that Title VII "contains anti-discrimination and anti-retaliation provisions that are indistinguishable from those of the ADA" as incorporated into the Rehabilitation Act); *see also Munro v. LaHood*, 839 F. Supp. 2d 354, 360 (D.D.C. 2012) (stating that the elements for a discrimination claim under Title VII and the Rehabilitation Act are the same).

B.   Materially Adverse Employment Actions

Plaintiff bases her discrimination and retaliation claims on the same set of facts.[6]   But several of the alleged discriminatory and retaliatory incidents cannot be considered to be the "adverse" employment actions necessary to make out the first element of Bonnette's prima facie case even though the concept of an adverse action in the retaliation context is more expansive than in the discrimination context.   *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).   "An adverse action in the retaliation context may involve something short of what ordinarily would be considered a 'personnel action' (*e.g.*, denial of promotion, discharge, salary reduction), but a plaintiff nonetheless must point to an action that a 'reasonable employee would have found . . . materially adverse.'"   *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 75 (D.D.C. 2007), quoting *Burlington*, 548 U.S. at 67–68.   A materially adverse action is one that results in significant harm or hardship, such as affecting the plaintiff's "position, grade level, salary, or promotion opportunities," *Taylor*, 571 F.3d at 1321 (internal quotation marks and citations omitted), and "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."   *Burlington*, 548 U.S. at 68, quoting *Rochon*, 438 F.3d at 1219.   Several of Bonnette's allegations do not meet this standard, and since they are not sufficiently adverse to support her retaliation claim, they cannot advance her discrimination claim either.

---

6      As the VA points out, the only allegations that could properly support retaliation claims would be those describing events that occurred after Bonnette engaged in protected activity by filing her first EEO complaint in January 2009.  Def.'s Mem. at 39.  Unfortunately, Bonnette's claims are often general and do not include specific dates or time frames.  But since the Court is granting the VA's motion for summary judgment because the alleged events – regardless of when they occurred – do not support claims for either discrimination or retaliation, it need not determine which incidents could only be considered as part of the discrimination claim and which occurred after the protected activity and are thus part of the retaliation claim as well.

1.   *Work Place Disagreements and Conflicts*

Plaintiff was clearly frustrated by her interactions with her exacting supervisor, and her complaint details a series of annoying and embarrassing workplace grievances.  But the law is clear that "'purely subjective injuries,' such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions, the threshold is met when an employee 'experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'"  *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006), quoting *Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002).  Applying that standard, the Court finds that the following allegations are the sorts of purely subjective injuries or disagreements about management policies and decisions that do not qualify as adverse:

- the fact that Therit described Bonnette's Christmas tree as ugly, prompting co-workers to make "abusive comments" about the tree, Compl. ¶¶ 74–77;

- Therit's oral reprimand of Bonnette for walking to work with co-workers, *id*. ¶ 81;

- Bonnette's "public embarrassment" at a Christmas brunch, *id*. ¶¶ 88–89;

- the failure to issue Bonnette a business expense credit card, *id.* ¶ 87;

- the dispute that arose when Bonnette obtained the data use card for access to locked areas from the building engineer, *id*. ¶ 91;

- the allegation that Therit embarrassed Bonnette before an audience of mediators and coordinators, *id*. ¶ 100;

- the allegation that "Therit had a habit of coming to the door of Plaintiff's work space and standing there talking to plaintiff at the end of her hour of duty," thereby delaying Bonnette's departure at the end of the day, *id*. ¶¶ 52–55;

- the claims that Therit micromanaged Bonnette's work and imposed unfair deadlines, *id*. ¶¶ 95, 97, and made what Bonnette characterizes as unjustified accusations that she mishandled a case during her PIP period, *id*. ¶ 106;

- the claim that Therit falsely stated "that other employees had 'issues' with" Bonnette, *id*. ¶¶ 92–94;

- the electronic files and folders that were scattered on the Bonnette's hard drive or missing when Bonnette returned to work at the VA, *id*. ¶¶ 101–02;

- the failure to reassign Bonnette to a different supervisor or a different position, *id*. ¶¶ 33–34; and

- the series of allegations that Bonnette was assigned to work with "a difficult person" in another office on a particular project, that Therit informed that co-worker that Bonnette was blind, and that Therit later "ridiculed" Bonnette's statement that she had been assigned to lead the work group during the other employee's absence. *Id*. ¶¶ 38–51.

*See Baloch*, 550 F.3d at 1197, 1199 (holding that "sporadic verbal altercations or disagreements" and "false accusations without negative employment consequences do not qualify as adverse actions for purposes of retaliation claims" and that courts should not engage in "judicial micromanagement of business practices by second-guessing employers' decisions"). Therefore, the Court concludes that these incidents are precisely the kind of "petty slights or minor annoyances" that cannot form the basis of a retaliation claim. *See Burlington*, 548 U.S. at 68.

2. *Written Admonishment*

Furthermore, the written admonishment Bonnette received for her failure to attend the training session, Compl. ¶¶ 60–73, was not a materially adverse event. A letter of reprimand is not materially adverse if it "contained no abusive language but rather job-related criticism." *See Herbert v. Architect of Capitol*, 766 F. Supp. 2d 59, 75 (D.D.C. 2011), quoting *Baloch*, 550 F.3d at 1199 (holding that a letter of reprimand that contained no abusive language cannot be transformed into an actionable adverse action because it threatened the employee with "more severe disciplinary action . . . up to and including removal from employment" if the employee committed another infraction). Since Bonnette has not alleged that the reprimand contained abusive language or that it affected her position, grade level, salary, or promotion opportunities,

no reasonable jury could find that the VA's written admonishment for Bonnette's flawed decision to send her sighted reader to a training session while she attended a holiday party was materially adverse.

    3. *Return to Work and Performance Improvement Plans*

As the VA argues, the return to work plan and the PIP were not materially adverse events either.   A PIP placement can constitute an adverse employment action where it exposes the individual to direct economic harm such as loss of salary, benefits, position, or promotional opportunities.  *See Porter v. Shah*, 606 F.3d 809, 818 (D.C. Cir. 2010).   But the sole act of placing a plaintiff on a PIP without more does not constitute an adverse employment action. *Kelly v. Mills*, 677 F. Supp. 2d 206, 222 (D.D.C. 2010) ("The PIP placement itself had no effect on the terms or conditions of [plaintiff's] employment and thus was not 'materially adverse' because it did not cause a 'significant change in employment status.'").   In *Porter*, the court held that a negative performance rating combined with a PIP constituted a material adverse action because the two actions could "expose [the plaintiff] to removal, reduction in grade, withholding of within grade increase or reassignment."   606 F.3d at 818.   But here, unlike in *Porter*, the VA did not combine Bonnette's PIP or the work plan with a negative performance rating.   Neither of these plans purported to affect the terms or conditions of Bonnette's employment; instead, they gave Bonnette time "to demonstrate fully successful performance."   Ex. 17 to Def.'s Mot. at 13– 14.   While Bonnette's failure to fulfill the requirements of the plans ultimately led to her termination, she has not argued or demonstrated that the placement on these plans itself caused her to suffer any significant change in her employment status.  *See Kelly*, 677 F. Supp. 2d at 222.

4.  *Alleged Diminution of Bonnette's Duties*

Bonnette alleges that the VA downgraded the quality of her employment responsibilities, Compl. ¶¶ 17–19, 31, 78, 98–99, by, in part, assigning her work that was "felt lots more like a clerical job than anything a GS-11 would be doing on a routine basis." Bonnette EEO Affidavit (July 6 and 10, 2009), Ex. 1 to Pl.'s Opp. at 223.  A reassignment of job duties can be materially adverse under certain circumstances.  *Burlington*, 548 U.S. at 71 (holding that reassigning an employee to a task that was "by all accounts more arduous and dirtier" could be materially adverse).  However, Bonnette cannot show that performing some clerical work reduced the prestige of her position because, by her own admission, all employees had to do some clerical work because the office did not utilize secretaries.  Bonnette Dep. at 112:23–113:2.  Bonnette also alleges that the VA denied her "the right to mediate disputes."  Compl. ¶ 82.  However, as the VA has explained, ORM, the agency where Bonnette worked, oversees mediation services but does mediate disputes.  Therit EEO Aff. at 297–98; Torres EEO Aff. at 357.  Further, even assuming that the VA reduced some of Bonnette's duties and denied her the opportunity to mediate disputes, Bonnette has not shown that such a reduction or denial was materially adverse because she does not allege that it affected her work hours or pay.  *See Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997) ("[C]hanges in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes.").[7]

---

7       Even if Bonnette could show that she experienced a materially adverse reduction in her responsibilities, defendant would still be entitled to summary judgment with respect to these claims because Bonnette has not provided any evidence that the change was motivated by discrimination or retaliation.  *See Baloch*, 550 F.3d at 1198 (holding that "even assuming that [the plaintiff] had suffered an adverse employment action [a shift in responsibilities], he did not produce evidence sufficient to overcome summary judgment on the question whether he suffered impermissible discrimination").

In sum, the Court concludes that while the allegations in paragraphs 17–19, 31, 33–34, 38–55, 60–78, 81–82, 84, 87–89, 91–102, and 106 of Bonnette's complaint may have been unpleasant, frustrating, and inconvenient, Title VII does not create or require federal courts to enforce "a general civility code for the American workplace." *Burlington*, 548 U.S. at 68, quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).  As the court observed in *Kelly*:  "Plaintiff may have preferred a supervisor with a more affectionate or inclusive management style, but [she] has not provided the Court with an explanation of how any or all of these events constituted a 'significant change in employment status' or had 'any effect on the salary, benefits, or grade' of [her] employment responsibilities or future employment opportunities."  677 F. Supp. 2d at 221, quoting *Blackmon-Malloy v. U.S. Capitol Police Bd*., 338 F. Supp. 2d 97, 106 (D.D.C. 2004) (alterations omitted).  So, these allegations do not support Bonnette's retaliation claim in Count 2.

And because Bonnette has failed to establish that the challenged actions described in the paragraphs listed above are materially adverse under the more liberal retaliation rubric, her discrimination claims also fail as to those incidents.  *See Herbert*, 766 F. Supp. 2d at 80.

C.  <u>Remaining Retaliation and Discrimination Claims</u>

What remains of the complaint, then, are the allegations that the VA placed Bonnette on paid administrative leave and terminated her employment in February 2009 and again in March 2010, Compl. ¶ 108; Pl.'s Opp. at 2, 5, failed to compensate her for working overtime, Compl. ¶¶ 25–26, and "submitted a false report contending that Plaintiff was a security risk," Compl. ¶ 107. Since the VA has proffered explanations for these actions, the Court need only consider whether Bonnette's "evidence creates a material dispute on the ultimate issue of retaliation [and discrimination] either directly by [showing] that a discriminatory reason more likely motivated

the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jones*, 557 F.3d at 678 (internal citation and quotation marks omitted).[8]  Bonnette must present enough evidence to allow a reasonable jury to infer "that the employer's given explanation was pretextual" and "shielded discriminatory motives." *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005); *Jones*, 557 F.3d at 678, citing *Aikens*, 460 U.S. at 715.  After reviewing all of the evidence, the Court concludes that Bonnette has not met this burden.

1. *Administrative Leave and Termination*

The VA argues that it placed Bonnette on paid administrative leave and terminated her employment in February 2009 because she "[1] failed to complete assignments on time, [2] committed three privacy violations, [3] misused government credit cards, [4] skipped mandatory training, and [5] misused government resources."  Def.'s Reply at 4.  Similarly, the VA contends that it terminated Bonnette's employment again in 2010 because her performance remained inadequate between March 2009 and March 2010, and she failed to complete a number of tasks in a timely manner or at all.  Def.'s Mem. at 37–38.  The VA has offered evidence in the form of statements from Bonnette's supervisors, emails between Bonnette and her supervisor regarding her performance deficiencies, letters of reprimand, and performance evaluations to support its assertions.  The evidence proffered by Bonnette in response is not sufficient to support the inference that these are pretextual assertions.

---

8       Once "the defendant proffers a nondiscriminatory and nonretaliatory rationale, it is unnecessary to consider whether the plaintiff actually made out the elements of a prima facie case," and the only question becomes whether the defendant intentionally discriminated against the plaintiff.  *Kersey*, 586 F.3d at 17, n.2. citing *Aikens*, 460 U.S. at 715.  "The defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  *Texas Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (internal citations omitted).

a.  Temporal Proximity

The main evidence that Bonnette proffers to support her allegation of retaliatory and discriminatory animus is the temporal proximity between her January 2009 EEO complaint and her placement on administrative leave and termination in February 2009.  However, temporal proximity without more is insufficient to prove that the defendant's legitimate non-retaliatory reasons are pretextual.  *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011) ("Although an adverse action that occurs shortly after protected activity can be part of a finding of retaliation, positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine[.]") (internal citations and quotation marks omitted).

In *Ginger v. District of Columbia*, 527 F.3d 1340, 1346–47 (D.C. Cir. 2008), the D.C. Circuit held that although the materially adverse action occurred one month after the filing of plaintiff's EEO claims, temporal proximity alone was insufficient to overcome the defendant's legitimate explanation because the plaintiffs did not dispute the defendant's reasons and failed to provide evidence as to why those reasons were pretextual.  As in *Ginger*, Bonnette does not dispute the facts underlying the VA's explanations.  Rather, she admits that she had performance deficiencies, disclosed confidential information, misused her government issued travel card, and missed part of a mandatory training session.  Pl.'s Opp. at 10–11; Bonnette Dep. at 133:4–136:20, 142:15–145:1, 164:18–166:16.  Bonnette's temporal proximity argument is further undermined by the undisputed fact that the VA was considering terminating her before she filed her 2009 EEO complaint.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned [actions] upon discovering that a [discrimination] suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."]; *see also*

Plaintiff's Answers to Defendant's Interrogatories, Ex. 14 to Def.'s Mot. ¶ 6 (Bonnette has stated that she was "threatened . . . with termination [in] December 2008" before her 2009 EEO complaint).  So although the termination decision followed the filing of the EEO case, *see* Def. St. Facts ¶ 60, Bonnette has not provided evidence that would enable a reasonable jury to find that the VA's proffered set of justifications was pretextual.

b.   Bonnette's Explanations for the VA's Justifications

Although Bonnette does not dispute the facts underlying the VA's rationale for her termination, she attempts to challenge the fairness of the agency's explanations by offering excuses for each of the events.  However, "[i]t is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible.  [She] must show that the explanation given is a phony reason."  *Sewell v. Chao*, 532 F. Supp. 2d 126, 138 (D.D.C. 2008), citing *Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994).  "'Once the employer has articulated a non-discriminatory reason for its action, . . . the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers.'"  *Id.*, quoting *Fischbach v. D.C. Dep't. of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  None of Bonnette's excuses undermines the credibility of the VA's proffered reasons.

First, with respect to her commission of "privacy violations," Bonnette argues that they were *de minimis*, she questions whether they constituted "privacy violations" at all, and she asserts that she was unable to see the confidential information contained in the relevant emails. Pl.'s Opp. at 10-11; Pl.'s St. Facts ¶¶ 46–48.  But the prompt reaction after the first incident suggests that these occurrences were in fact privacy violations and were not *de minimis*. Bonnette's supervisor reported the first privacy violation to the ORM Privacy Officer and Bonnette received general privacy awareness training thereafter.  Def.'s St. Facts ¶ 46.  Further,

in an effort to avoid future incidents, Bonnette's supervisor asked to review similar emails in the future before Bonnette was to send them.  *Id.*  Despite this specific instruction, Bonnette sent two additional emails containing confidential information without her supervisor's review and approval.  Thus, Bonnette cannot attribute these two incidents to her disability.

Second, Bonnette contends that she accidentally misused her government travel card because she could not distinguish between her personal credit card and the government issued card.  Bonnette Dep. at 133:4–135:4.  Even if the Court credits this explanation and it declines to speculate about practical solutions that could have been adopted to avoid this problem, the "misuse of government-issued credit cards is widely accepted to be a legitimate reason to impose disciplinary action," and Bonnette has provided no evidence demonstrating that the reprimand for this misconduct was motivated by discrimination or retaliation.  *See Bolden v. Clinton*, 847 F. Supp. 2d 28, 37 (D.D.C. 2012) (holding that a plaintiff failed to show that her suspension for her misuse of a government issued credit card was based on discrimination where she failed to show any causal connection between the challenged act and her race or age).

Third, with respect to the failure to attend part of the mandatory training, Bonnette asserts that she received permission from one of her supervisors and the trainer.  Pl.'s St. Facts ¶ 53. The VA disputes this assertion, noting that Bonnette simply informed the trainer that she would miss part of the training because of a Christmas party and the supervisor in question did not recall giving Bonnette permission to miss the training.  *See* Letter of Reprimand, Ex. 15 to Def.'s Mot. at 1–2; Torres EEO Aff. at 370.  Bonnette also argues that the VA did not chastise any other employee for attending the Christmas sing-along.  Compl. ¶ 67. But that statement alone does not prove discriminatory or retaliatory intent because Bonnette does not indicate whether another employee missed a mandatory meeting in order to attend the event.  It also does not

excuse the poor judgment Bonnette exercised on this occasion:  the agency provided a sighted reader to work with her to accommodate her disability – not to serve as a surrogate who could attend employment related events in her stead when she preferred to be elsewhere.  In any event, Bonnette's excuses relate only to whether the VA's consideration of this occurrence in deciding to terminate Bonnette's employment was fair and not whether the reason was pretextual.

Finally, Bonnette asserts that her performance was not deficient because she was rated as "fully successful" for her first eighteen months, she was promoted from GS-12 to GS-13, and that any performance deficiencies were caused by her second supervisor's delay in providing the necessary approvals for her projects.  Pl.'s Opp. at 11, 13–16.  But the record shows that despite her initial "fully successful" ratings and her promotion, Bonnette received feedback about how she needed to improve.  Therit EEO Aff. at 316.  For example, in December 2008, Therit informed Bonnette that her performance was "less than satisfactory," and she detailed a number of tasks that Bonnette had to complete in the following month.  Ex. 28 to Def.'s Mot.  Bonnette admits that she failed to complete these tasks, but she contends the her failure to meet these and other deadlines were caused by Therit's purposeful delay in providing the necessary approvals for her projects.  According to Bonnette, Therit's delay in granting the necessary approvals "virtually guarantee[ed] that Bonnette would not be able to meet the requirements of the return to work standards" and the PIP.  Pl.'s Opp. at 4, 12–17.

In *Sewell*, the court rejected the plaintiff's contention that she was "set-up" to fail because she was denied the training needed to fulfill her responsibilities.  532 F. Supp. 2d at 139. The court found that argument to be undercut by the evidence because the plaintiff's supervisors told her who to contact for the necessary training, asked her to report back if she had any issues acquiring the training, expected her to do the work, and the plaintiff did not follow up to let them

know that she had not received the training.  *Id*. at 140.  As in *Sewell*, Bonnette's argument fails, since it is contradicted by the very evidence she proffers.

The two emails Bonnette cites reflect that Therit responded to her request for feedback expeditiously.  Bonnette sent the first email on a Friday by asking for feedback on a project.  Ex. 18 to Pl.'s Opp. at 305–07.  In a lengthy response sent on Sunday, Therit provided detailed edits, agreed with some of Bonnette's suggestions, noted that Bonnette had already failed to meet the deadlines on the assignment, and asked to meet to "explore ways to ensure deadlines are met and assignments completed timely."  *Id*.  In the second email exchange, Therit responded to Bonnette's request for feedback within minutes and asked Bonnette to propose an alternative topic for the teleconference she was planning.  Ex. 17 to Pl.'s Opp. at 433.  Thus the emails do not show that Therit obstructed Bonnette's progress, much less that she did so with any retaliatory or discriminatory animus.

Similarly, the two affidavits from Cassandra Harmon, Bonnette's sighted reader, fail to provide the evidence necessary to show that the VA's actions were discriminatory.  Harmon does say that Therit "hindered Ms. Bonnette's ability to complete [an] assignment based on the timeline" that Therit presented by rejecting timelines that had formatting issues or clerical errors and by cancelling and refusing to re-schedule meetings.  Harmon Affidavit, Ex. 9 to Pl.'s Opp. at 1.  She adds that Therit denied or refused to respond to Bonnette's request for deadline extensions.  *Id*.; Pl.'s Opp. at 4.  But even if those observations are accurate, they only show that Bonnette's supervisor was a busy, demanding, and difficult manager who by her own admission cannot recall approving a timeline for any employee after only one draft.  Therit Dep. at 148:1–21.  Harmon cannot provide evidence that Therit's actions were motivated by retaliatory animus.  *See Sewell*, 532 F. Supp. 2d at 143 ("Plaintiff has demonstrated that [her supervisor] was a

difficult or demanding manager, but she has not shown that any of the hostility evidenced by [the supervisor] was motivated by discriminatory or retaliatory animus.").

Therefore, the Court concludes that Bonnette's excuses and explanations relate to whether her placement on administrative leave and termination were "just, or fair, or sensible" and that they are insufficient to carry her burden to demonstrate that the VA's proffered reasons were pretextual.

### 2.   *Compensation for Overtime*

Bonnette alleges that the VA failed to compensate her for working overtime.   Compl. ¶¶ 25–26.   The VA has explained that it has a policy of not awarding overtime unless it was approved in advance.   Def.'s Mem. at 32.   Bonnette has not alleged that she obtained advance approval or that the VA applied its overtime policy in a discriminatory or retaliatory manner. She has thus failed to provide any reason for a reasonable jury to find the VA's proffered explanation unworthy of credence.

### 3.   *Security Alert*

Bonnette asserts that Therit "submitted a false report contending that Plaintiff was a security risk" after she was discharged.   Compl. ¶ 107.   In response, the VA has stated that Therit did not participate in or have any control over the issuance of the security alert.   Def.'s Mem. at 35–36.   But even if Therit was involved in the issuance of the security alert, Bonnette's mere conclusion that the security alert was issued "because of her blindness" is insufficient proof of retaliatory or discriminatory animus.   *See Anderson*, 477 U.S. at 252 (stating that to survive summary judgment, the non-movant may not rest upon the mere allegations or denials of its pleadings, but must instead establish more than "the mere existence of a scintilla of evidence" in support of its position).

Since Bonnette has failed to rebut the VA's proffered legitimate, nondiscriminatory, and non-retaliatory reasons for its actions, the Court will grant the VA's motion for summary judgment on the remaining discrimination and retaliation claims.

## II. Reasonable Accommodation

Bonnette also alleges that the VA failed to accommodate her disability as required by law. The Rehabilitation Act requires employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business[.]" 42 U.S.C. § 12112(b)(5)(A). To establish that the defendant failed to provide a reasonable accommodation, the plaintiff must show that: (1) she has a disability within the meaning of the statute; (2) the defendant had notice of her disability; (3) she could perform the essential functions of the employment position with or without reasonable accommodation; and (4) the defendant refused to make the accommodation. *See Faison v. Vance-Cooks*, 2012 WL 4789172, at *5 (D.D.C. Oct. 9, 2012), citing *Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007). If the plaintiff establishes a prima facie case of failure to provide reasonable accommodation, then it is up to the employer to demonstrate that the accommodation would have imposed an undue burden on its business; the ultimate burden however, remains with the plaintiff. *Faison*, 2012 WL 4789172, at *5, citing *Barth v. Gelb*, 2 F.3d 1189, 1185–86 (D.C. Cir. 1993) (explaining that the three part burden-shifting framework set forth for in *McDonnell*, 411 U.S. 792 (1973), does not apply to reasonable accommodation claims; such claims should be tested through the "application of traditional burdens of proof").

The VA does not contest the first two elements: that Bonnette has a disability within the meaning of the statute or that it knew about the disability. It asserts, though, that Bonnette was

not a "qualified individual" who could perform the functions of her job with or without accommodations, and that, in any event, the VA reasonably accommodated her disability. Where a plaintiff, like Bonnette, concedes that she cannot perform the essential functions of her job without some form of accommodation, "the regulation requires [the Court] to ask simply whether any reasonable accommodation would have allowed [Bonnette] to perform all the essential functions of her job without creating an undue hardship for the agency".[9]  *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994).  To survive summary judgment, Bonnette must demonstrate that the VA failed to provide reasonable accommodations that would have allowed her to perform her essential employment functions, and the VA must fail to show that such accommodations would have caused an undue burden.  *See Graffius v. Shinseki*, 672 F. Supp. 2d 119, 126 (D.D.C. 2009).

Bonnette asserts that she requested the following reasonable accommodations:   (1) replacement of Adrienne Leal as her sighted reader; (2) accommodation of her service dog; and (3) exclusive use of the unisex restroom and/or access to the ladies restroom.[10]  After a review of

---

[9]    The "with or without reasonable accommodation" language means "*either* with accommodation or without it: that is, an individual with handicaps is qualified if she can perform the essential functions of her position with reasonable accommodation.  If she can perform these functions without reasonable accommodation, so much the better—she is, of course, still qualified."  *Carr*, 23 F.3d at 529 (emphasis in original).  Here, Bonnette has admitted that she needed reasonable accommodations to perform her essential employment functions.  Pl.'s Opp. at 19.  So the Court will not consider whether Bonnette could have performed her duties without reasonable accommodation.

[10]    These three requests are the only ones that are still at issue.  In her complaint, Bonnette also alleges that she requested the use of JAWS software and other scanning and adaptive equipment.  Compl. ¶ 112.  But she did not contest the evidence presented by the VA that it in fact accommodated these requests.  Therefore, the Court will treat these allegations as conceded.  *See FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997) (when a party does not address arguments advanced by her opponent, the court may treat those arguments as conceded).

the record, the Court concludes that the VA reasonably accommodated Bonnette's needs for a

sighted reader, a service dog, and an accessible restroom.

A.  Sighted Reader

The complaint sets out Bonnette's dissatisfaction with one of her sighted readers.  But

"[a]n employer is not required to provide an employee that accommodation [she] requests or

prefers, the employer need only provide some reasonable accommodation."  *Aka v. Wash. Hosp.*

*Ctr* ., 156 F.3d 1284, 1301 (D.C. Cir. 1998), quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492,

499 (7th Cir. 1996).   The D.C. Circuit has defined a "reasonable accommodation" as one

"employing a method of accommodation that is reasonable in the run of cases . . . ." *Barth*, 2

F.3d at 1187 (emphasis omitted); *see also Norden v. Samper*, 503 F. Supp. 2d 130, 145 (D.D.C.

2007) ("[A]ccommodations are reasonable if they allow the employee to perform the essential

functions of the job without imposing undue hardship on the employer.").

In *Carter v. Bennett*, 840 F.2d 63 (D.C. Cir. 1988), a blind plaintiff asserted that his

employer did not reasonably accommodate his disability. He complained that he had the

assistance of sighted readers for only 18 hours a week, he did not choose his readers, he had

repeatedly told his supervisors that his readers "could not read" and "didn't have the skills

necessary," and he did not get the reader of his choice until later in his employment.  *Id*. at 67.

But even under those circumstances, the D.C. Circuit upheld the district court's dismissal of the

plaintiff's reasonable accommodation claim because the employer attempted to secure a full-time

reader with plaintiff's input, and even after the plaintiff received the reader of his choice, his

supervisors continued to find his work unsatisfactory. *Id*. at 68.

The facts of this case are even less compelling than those presented in *Carter*.  The VA

provided Bonnette with a full-time sighted reader.  It permitted her to be extensively involved in

hiring and training her readers, worked with her to define the duties of the sighted reader, and solicited and used her input to remedy her sighted reader's alleged performance deficiencies. *See* Ex. 15 to Pl.'s Opp.; Def. St. Facts ¶¶ 26–27.  Moreover, even when Bonnette received the reader of her choice, her supervisors remained unsatisfied with her performance.  *See* Decision-Proposed Removal, Ex. 19 to Def.'s Mot.

Bonnette's reliance on *Porter v. Jackson*, 668 F. Supp. 2d 222 (D.D.C. 2009) and *Bonnette v. D.C. Court of Appeals*, 796 F. Supp. 2d 164, 171 (D.D.C. 2011) is misplaced. Bonnette cites *Porter* for the proposition that "where, as here, the Defendant argues that it has provided a reasonable accommodation to Bonnette, that accommodation must exceed the reasonable minimum standards . . . ." Pl.'s Opp. at 20.  This is a misrepresentation of *Porter*.  In that case the court simply noted the defendant's argument that its proffered accommodation was reasonable because it exceeded minimum standards.  *Porter*, 668 F. Supp. 2d at 234.  At no point did the court create a new standard based on that argument; rather, it found that the plaintiff's accommodation request was unreasonable in light of the defendant's proposed reasonable accommodation.  *Id.* at 234–35.

Although plaintiff's characterization of the *Bonnette* case is accurate, that case is distinguishable.  The ADA contains a provision that specifically addresses examinations such as the Multistate Bar Exam that was at issue in *Bonnette*.  The implementing regulation for that provision requires that such professional examinations be administered "so as to best ensure that, when the examination is administered to an individual with a disability . . ., the examination results accurately reflect the individual's aptitude or achievement level . . . ."  *Bonnette*, 796 F. Supp. 2d at 180.  The court's decision in *Bonnette* rested on that "best ensure" regulation and not on general principles regarding reasonable accommodations in the workplace.  *Id.* (holding that

the plaintiff was entitled to an auxiliary aid that would "best ensure" that her score reflected her achievement level).

Thus, the Court finds that the VA did not fail to reasonably accommodate Bonnette's need for a sighted reader.

### B.  Service Dog

Bonnette does not dispute that she was able to be accompanied in the workplace by her service dog.  Pl.'s Opp. at 20–21.  She also does not contest that the agency arranged for more frequent vacuuming because some of her colleagues had allergies to dog hair, that it paid $800 for a special air filter for dog dander, and that it addressed mistreatment from her co-workers about her service dog.  Def.'s St. Facts ¶¶ 35–36, *accord* Pl.'s St. Facts, ¶¶ 35–36.  Nonetheless, Bonnette argues that the VA did not reasonably accommodate her need for a service dog because on one occasion, Therit asked her to take the dog further away from the building to a highly trafficked area to allow the dog to relieve itself.  Pl.'s Opp. at 20–21.  The Court finds that no reasonably jury could conclude that the numerous steps that the VA took to accommodate Bonnette's service dog were inadequate because of a single incident of insensitivity.

### C.  Access to Restroom

Bonnette asserts that the VA failed to accommodate her when it instructed her not to use the women's restroom and informed her that the unisex restroom was for her exclusive use, but she walked in to discover a male employee using the unisex restroom on one occasion.  Pl.'s Opp. at 21.  While it may have been embarrassing, this single unfortunate incident does not demonstrate an unlawful failure to accommodate Bonnette's disability.

The VA has explained that some of its female employees were allergic to dogs, so to accommodate Bonnette's need to be accompanied by a service animal, it gave Bonnette special

access to a unisex restroom.   Def. Stat. Facts ¶ 23.   The agency notes that it was under the impression that Bonnette was the only one with a key to that room, and that after Bonnette was surprised by the male interloper, it took additional steps to ensure that Bonnette was the only person who could access the restroom.   Therit Dep. at 24:21–26:1.   Therefore, the Court concludes that even if Bonnette was instructed not to use the women's restroom, the VA reasonably accommodated her by taking steps to ensure that she had exclusive access to a reasonable and appropriate alternative.

In light of the undisputed evidence of the steps the VA undertook to accommodate Bonnette's needs, the Court will grant summary judgment for the defendant on the failure to accommodate claim.

### III. Hostile Work Environment

The complaint does not specifically allege that the VA was a hostile work environment. But in her opposition to the motion to dismiss, Bonnette argues that the facts are sufficient to support such a claim.   Pl.'s Opp. at 21–23.   Since the D.C. Circuit has been willing to assume that a hostile work environment could be a form of discrimination under the Rehabilitation Act, *see, e.g., Kuraner v. Mineta*, No. 00–5416, 2001 WL 936369, at *1 (D.C. Cir. July 10, 2001), the Court will assess the sufficiency of the evidence proffered by Bonnette under this rubric as well. But Bonnette's claim on this basis fails for the same reasons as those set forth above:   the complained-of events are simply petty, ordinary, workplace disputes, and there is no evidence that were motivated by discrimination.[11]

---

11      It is also unclear whether Bonnette's hostile work environment claim is discrimination-based or retaliation-based but this does not affect the Court's analysis because the legal standard is the same for either theory.   *Baloch*, 550 F.3d at 1201, citing *Harris v. Wackenhut Servs., Inc.*, 419 Fed. App'x 1, 12 (D.C. Cir. 2001).

The VA contends that Bonnette's hostile work environment claims should be dismissed because the "discrete and isolated incidents" that Bonnette identifies "cannot satisfy even the minimum criteria for a hostile work claim," and Bonnette has failed to demonstrate how any of these events were related to her disability or protected activities.  Def.'s Mem. at 42.  To make out a hostile work environment claim, a plaintiff must demonstrate that the "workplace is permeated with discriminatory intimidation, ridicule, and insult" and that this behavior is "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (internal citation and quotation marks omitted).   "To determine whether a hostile work environment exists, [courts] look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002), quoting *Harris*, 510 U.S. at 23; *see also Baloch*, 550 F.3d at 1201 (same).  This standard "ensure[s] that Title VII does not become a general civility code" that involves courts in policing "the ordinary tribulations of the workplace."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88, (1998) (internal citation and quotation marks omitted).

Bonnette's allegations cannot, as a matter of law, support a hostile work environment claim.  In alleging that the VA created a hostile working environment because of her disability, Bonnette simply points again to the separate minor incidents described in her discrimination and retaliation claims.  Pl.'s Opp. at 21–22.   Even assuming the veracity of Bonnette's allegations, there is not enough in this recitation to support a finding that the VA subjected her to conduct "sufficiently severe or pervasive to alter the conditions of [her] employment and create an

abusive working environment." *Harris*, 510 U.S. at 21, quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *see also Mahoney*, 824 F. Supp. 2d 49, 62–63 (D.D.C. 2011) (stating that where a plaintiff's allegations are not sufficiently severe to support a hostile environment claim, the court need not address whether plaintiff's claims are impermissibly based on the same facts used to support his discrete retaliation claims).

Bonnette admits that some of the alleged actions, such as the ridicule of her Christmas tree, in isolation would not qualify as creating a hostile work environment, but she avers that the "overwhelming continuity of [her supervisor's] actions toward [her] because of her blindness, e.g., denial of access to the woman's room, denial of business expense card and submission of the security alert status report provide sufficient evidence that this environment was created *because of* [Bonnette's] disability." Pl.'s Opp. at 22–23 (emphasis in original). But that connection is absent from the factual presentation. Only one of the issues – the inability to use the women's restroom – had any relationship to Bonnette's disability at all, and she has failed to show how this was hostile since she was provided with exclusive access to another facility and the change was needed to accommodate Bonnette's dog. Many of the challenged actions – placement on a PIP, micromanagement of her work, and the written admonishment for her failure to attend mandatory training – are the type of "work-related actions by supervisors" that provide insufficient grounds for a hostile work environment claim. *See Wade v. District of Columbia*, 780 F. Supp. 2d 1, 19 (D.D.C. 2011), citing *Nunridden v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2005) ("The removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management cannot be characterized as sufficiently intimidating or offensive in an ordinary workplace context.") (alterations omitted). The other incidents of "harassment," "embarrassment," and ridicule may have may have been unpleasant

and uncomfortable, but taken as a whole, they do not arise to the level needed to support a hostile work environment claim.  *See Hernandez v. Gutierrez*, 656 F. Supp. 2d 101, 106 n.6 (D.D.C. 2009) (no hostile work environment found even under such egregious facts as where "one co-worker frequently touched his private parts in front of [the plaintiff], told her his marriage was not the same as it used to be, talked to her about humans and animals having sex, showed her sexually explicit pictures, and told her that a paperclip could be used as a weapon and then . . . put a fist close to her face").  Bonnette gives the Court no basis for inferring that the alleged incidents were anything more than offensive or inconvenient.

Thus, because Bonnette has failed to allege facts sufficient to establish that the challenged acts were severe or pervasive enough to constitute a hostile work environment, any hostile work environment claim embedded somewhere in the complaint does not survive the VA's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Court will grant the VA's motion for summary judgment in full.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  November 30, 2012